# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JULY SESSION, 1999

FILED

September 10, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **BRETT ALLEN PATTERSON,** | ) | **C.C.A. NO. 01C01-9805-CC-00221** |
| | ) | |
| Appellant, | ) | |
| | ) | |
| | ) | **MONTGOMERY COUNTY** |
| **VS.** | ) | |
| | ) | **HON. ROBERT W. WEDEMEYER** |
| **STATE OF TENNESSEE,** | ) | **JUDGE** |
| | ) | |
| Appellee. | ) | **(Post-Conviction Relief)** |

FOR THE APPELLANT:

JOHN J. HOLLINS, JR.
Hollins, Wagster & Yarbrough
424 Church Street
2210 SunTrust Center
Nashville, TN  37219

FOR THE APPELLEE:

PAUL G. SUMMERS
Attorney General & Reporter

KIM R. HELPER
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN  37243-0493

JOHN CARNEY
District Attorney General

ARTHUR BIEBER
Assistant District Attorney
204 Franklin St., Suite 200
Clarksville, TN  37040

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

On February 23, 1988, Petitioner Brett Allen Patterson was convicted of two counts of first degree murder, one count of first degree burglary, and one count of aggravated rape. On March 18, 1988, Petitioner received consecutive sentences of life, life, and forty years for the two first degree murder convictions and the aggravated rape conviction. Petitioner also received a concurrent ten year sentence for his first degree burglary conviction. Petitioner's convictions and sentences were upheld by this Court on December 8, 1989. Petitioner filed a petition for post-conviction relief on October 29, 1992; a first amended petition for post-conviction relief on November 5, 1993; a second amended petition for post-conviction relief on December 4, 1995; and a third amended petition for post-conviction relief on September 13, 1996. After a two day hearing on December 9, 1996, and April 4, 1997, the post-conviction court dismissed the petition. Petitioner challenges the dismissal of his petition, raising the following issues:

> 1) whether Petitioner's statement to police should have been suppressed as the result of an illegal arrest;
> 2) whether trial counsel were ineffective in failing to conduct a full and fair hearing on the lawfulness of Petitioner's arrest;
> 3) whether the search warrant in this case was void because the supporting affidavit was invalid;
> 4) whether trial counsel were ineffective in failing to conduct a full and fair hearing on the validity of the warrant;
> 5) whether Petitioner was denied due process by being tried jointly with a codefendant;
> 6) whether trial counsel were ineffective in failing to seek a severance;
> 7) whether Petitioner's statement to police was inadmissible because it was involuntary;
> 8) whether trial counsel were ineffective in failing to conduct a full and fair hearing on the voluntariness of Petitioner's statement;
> 9) whether the trial court erred when it imposed consecutive sentencing;
> 10) whether appellate counsel was ineffective in failing to include the transcript of the sentencing hearing in the record on direct appeal;
> 11) whether the State's opening statement and closing argument were improper;

12) whether trial counsel were ineffective in failing to object to certain comments during the State's opening statement and closing argument; and

13) whether trial counsel were ineffective in the manner in which they investigated the case and conducted the trial.

After a review of the record, we affirm the judgment of the post-conviction court.

# I. BACKGROUND

## A. Trial

In State v. Brett Patterson, No. 88-245-III, 1989 WL 147404, at *1–2 (Tenn. Crim. App., Nashville, Dec. 8, 1989), this Court gave the following summary of the evidence presented at trial:

On the night of January 9, 1987, Brett Patterson and Ronnie Cauthern drove to the home of Patrick and Rosemary Smith, who were both Captains in the United States Army assigned to Fort Campbell as nurses. The defendants wore masks and gloves, and each carried a loaded revolver. After severing the telephone line, the defendants broke a door pane, unlocked the door, and entered the Smiths' house. They were after a large sum of money thought to be kept in the bedroom.

Once inside, the defendants discovered that the Smiths were at home asleep. They awakened them and pulled them out of bed. Patrick Smith tried to fight them off, while Patterson made repeated attempts to subdue him by applying a "sleeper," a wrestling hold designed to cause unconsciousness. Failing this, Patterson strangled Mr. Smith with a length of "880" military cord. Investigators later recovered similar cord from the defendant's residence when they searched it.

Mrs. Smith was strangled with a silk scarf into which a narrow vase was inserted to form a tourniquet. The medical examiner found that the cartilage in her throat had been fractured, an injury which would have resulted only from application of great force. Mrs. Smith had also been raped.

When neither of the Smiths reported for duty on the following morning, two of their co-workers drove to their home to investigate. Finding the door glass broken, they called the police. Investigators arrived promptly and discovered Patrick Smith's body in the master bedroom, and Rosemary Smith's body in a guest bedroom.

The house had been ransacked and numerous items stolen, including articles of clothing, seventy dollars cash, personal checks, credit cards, a video cassette recorder, Mrs. Smith's engagement and wedding rings, her watch, and her purse. The keys to their two cars were also taken.

In the master bedroom, investigators found a piece of paper with Cauthern's name on it. Also written on it was the Smiths' phone number, address, and directions to their residence.

On the morning of January 12, 1987, an informant contacted the police and told them that Patterson and Cauthern, both of whom the informant knew well, had admitted taking the Smiths' property, sexually abusing Mrs. Smith, and killing them both.

The informant related to investigators how Patterson and Cauthern had broken into the house, described the method by which the Smiths had been strangled, and told of having seen several of the items stolen from their residence. The informant said that Cauthern was confident that he and Patterson would not be caught because they had worn masks and gloves.

Investigators then proceeded to the residence that the defendant shared with Cauthern and a third person—Eric Barbee. When they arrived, all three men were present and officers saw several of the stolen items in the trunk of Cauthern's car.

The residence was searched, and a large amount of incriminating evidence was seized.

Both defendants were arrested; both gave detailed and highly inculpatory confessions.

### B. Post-conviction Hearing

David Baize testified that he was employed by the Clarksville Police Department in January of 1987. At that time, Baize received a tip about the Smith case from confidential informant James Andrew.[1] Baize subsequently met with Andrew and took a statement from him. Although Baize knew that Andrew had had "misdemeanor problems" in the past, Baize felt that he was reliable because he was able to provide details about the Smith case that could have only been obtained from someone who had been in the Smith home.

Bobby Gray testified that he was employed by the Clarksville Police Department in January of 1987. Although Gray provided some of the information for the affidavit in support of search warrants for the residences of Petitioner and

---

[1]We note that in many of the proceedings in this case, Andrew is referred to as "Andrews." However, a review of the record indicates that "Andrew" is the correct name.

Cauthern, he had not talked to Andrew and had not checked to see whether Andrew had a criminal record.

Gray testified that he was present when Petitioner was arrested. When Gray and other officers went to the residences of Petitioner and Cauthern, Petitioner and Cauthern were working on a car that contained the Smiths' checkbook and credit cards in plain view of the officers.

Agent Mike Breedlove testified that he was present when Petitioner gave a taped statement to police in January of 1987. Although some of Petitioner's statement was recorded, there was a portion that was not recorded. Toward the end of the interview, Breedlove and Petitioner discussed the difference between a life and a death sentence, and Breedlove told Petitioner that his cooperation with police could be considered by a jury when determining whether to impose a death sentence.

John Richardson testified that he was one of the attorneys who represented Petitioner at trial. Richardson and his co-counsel did not put on any defense during the guilt phase and did not introduce any mental history evidence during sentencing. Richardson also waived argument during the guilt phase as a tactical decision. Richardson did not recall whether the State turned over the criminal records of Andrew and one of the State's witnesses, Joe Denning. Richardson never interviewed Andrew or Denning and never made a motion to sever Petitioner's trial from that of Cauthern.

Richardson testified that from a tactical standpoint, he and his co-counsel wanted Petitioner to be tried with Cauthern. Richardson believed that the best strategy would be to try and separate the break-in by Petitioner from the actual murders committed by Cauthern.

Lionel Barrett testified that he also represented Petitioner. Barrett did not recall whether the State provided the defense with the criminal records of Andrew and Denning. Barrett also did not recall whether the State had provided any information about deals it had made with witnesses.

Officer Robert Hunt of the Clarksville Police Department testified that he is the records custodian for the department. Hunt testified that originally, certain arrest records were in the County's computer system and the County's records were copied and transferred into the Clarksville Police Department computer system in September of 1993.

Wade Bobo testified that he prosecuted this case at trial. Bobo disclosed the agreement he had with Denning to the defense. Bobo had an agreement with Eric Barbee to dismiss some charges if Barbee cooperated in the investigation of the case. Bobo could not remember whether he disclosed the agreement he had with Barbee to the defense.

Joseph Griffey testified that he was working for the Clarksville Police Department in January of 1987. Griffey testified that he provided the information for the search warrant affidavits based on his personal observations and on his interview with Andrew. Griffey personally checked the city computer database

to determine whether Andrew had a criminal record and the database indicated that Andrew did not have a record. Griffey admitted that the statement in the affidavits that the informant was reliable was based on information he received from Baize.

Petitioner testified that when he was questioned by detectives, they told him that Cauthern and Barbee had put the blame on him and if he would confess, things would go better for him and it could be the difference between a life or a death sentence. Petitioner claimed that the detectives told him that anything he said would not be publicized. Petitioner testified that he wanted to testify at trial, but he was prevented from doing so by his counsel. Petitioner stated that his attorneys never followed up on his court ordered mental evaluation. He also stated that his attorneys failed to include a transcript of the sentencing hearing in the record on direct appeal and thus, the appellate court ruled that any sentencing issues were waived. Petitioner also testified that his attorneys failed to interview witnesses and failed to investigate to see whether the State's witnesses had criminal records or whether they had made deals with the State.

## II. PREVIOUSLY DETERMINED ISSUES

Initially, we note that Petitioner has raised several issues that were addressed by this Court on direct appeal. Specifically, Petitioner contends: that his warrantless arrest was illegal and any evidence obtained pursuant to the arrest should have been suppressed, that the search warrant in this case was invalid and any evidence seized pursuant to the warrant should have been suppressed, that he was deprived of a fair trial because his statement to police

was redacted to eliminate any reference to Cauthern, that his statement to police was involuntary and was therefore inadmissible, that he should have received concurrent sentences, and that the prosecutor's opening statement and closing argument were improper. The post-conviction court found that these issues were not cognizable in a post-conviction proceeding because they were previously determined on direct appeal. We agree with the post-conviction court.[2]

When Petitioner filed his petition in 1992, Tennessee Code Annotated section 40-30-111 provided

> The scope of the [post-conviction] hearing shall extend to all grounds the petitioner may have, except those grounds which the court finds should be excluded because they have been waived or previously determined . . . .

Tenn. Code Ann. § 40-30-111 (1990). In addition, Tennessee Code Annotated section 40-30-112(a) provided

> A ground for relief is "previously determined" if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.

Tenn. Code Ann. § 40-30-111(a) (1990).[3] A full and fair hearing sufficient to support a finding of previous determination occurs if a petitioner is given the opportunity to present proof and argument on the claim. House v. State, 911 S.W.2d 705, 711 (Tenn. 1995).

In the direct appeal of this case, this Court held that Petitioner's arrest was lawful, Brett Patterson, 1989 WL 147404, at *3–4; that the search warrant was

---

[2]We note that in addition to the fact that it is not cognizable because it was previously determined, Petitioner's claim that the trial court erred when it imposed consecutive sentencing is not cognizable because a petitioner cannot seek review of the length or manner of serving sentences in a post-conviction proceeding. See Andrea Jones v. State, No. 02OC01-9603-CR-00084, 1997 WL 68330, at *1 (Tenn. Crim. App., Jackson, Feb. 20, 1997).

[3]These statutes were repealed on May 10, 1995. The statute that replaced these statutes also provides that previously determined issues are not cognizable in a post-conviction proceeding. See Tenn. Code Ann. § 40-30-206(f), (h) (1997).

valid, id., 1989 WL 147404 at *5–6; that admission of Petitioner's redacted statement was proper, id., 1989 WL 147404 at *6–7; that the record fully supported consecutive sentences, id., 1989 WL 147404 at *9; that Petitioner's statement to police was voluntary, id., 1989 WL 147404 at *4–5; and that Petitioner was not prejudiced by the prosecutor's opening statement or closing argument, id., 1989 WL 147404 at *7. Because this Court addressed each of this issues on direct appeal after Petitioner had been given the opportunity to present proof and argument for the issues, these issues are not cognizable in this post-conviction proceeding.[4]

## III. ASSISTANCE OF COUNSEL

Petitioner contends that the post-conviction court erred when it determined that his counsel had provided effective representation. Specifically, Petitioner claims that his counsel were ineffective because: they failed to adequately address the legality of Petitioner's arrest, they failed to adequately address the validity of the search warrant, they failed to file a motion to sever the trial of Petitioner from that of Cauthern, they failed to adequately address the voluntariness of Petitioner's statement, they failed to include the transcript of the sentencing hearing in the record on direct appeal, they failed to object to portions of the prosecutor's opening statement and closing argument, they failed to adequately investigate the case, and they were deficient in the manner in which they conducted the trial.

---

[4]Petitioner urges us to reconsider the merits of these issues in light of additional facts that were established at the post-conviction hearing. However, this Court has previously stated that "[a] petitioner may not relitigate a previously determined issue by presenting additional factual allegations." Cone v. State, 927 S.W.2d 579, 582 (Tenn. Crim. App. 1995).

Article I, Section 9 of the Tennessee Constitution provides "that in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel." Tenn. Const. art I, § 9. Similarly, the Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. "These constitutional provisions afford to the accused in a criminal prosecution the right to effective assistance of counsel." Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial. Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advise given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." Id. "Moreover, on appeal, the findings

-10-

of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them." Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "The burden is on the petitioner to show that the evidence preponderated against those findings." Id.

## A. Arrest

Petitioner contends that his trial counsel were ineffective because they failed to adequately challenge the legality of his arrest by arguing that the arrest was not supported by probable cause.

First, Petitioner claims that his trial counsel were ineffective because they failed to argue that Petitioner's arrest was not supported by probable cause since he alleges the arresting officers had no basis for determining that he was involved in the crimes at the Smith residence. This claim is not accurate. The record indicates that Petitioner's trial counsel filed a motion to suppress Petitioner's statement to police alleging it was the product of an illegal arrest. The record also indicates that during the suppression hearing, Petitioner's counsel questioned Gray extensively about whether there was probable cause to arrest Petitioner. Indeed, Petitioner's counsel asked Gray whether he had seen any evidence at the time of arrest that tied Petitioner to the crimes, whether he had previously received information that Petitioner was involved in the crimes, and whether the information received from Andrew was reliable.

Second, Petitioner contends that because the only information the police had that tied him to the crimes came from Andrew, trial counsel was ineffective

in failing to call Baize to testify since Baize was the person who actually interviewed Andrew. However, Petitioner has failed to identify any testimony that Baize could or would have given that would have had any effect on the determination of whether Petitioner's arrest was supported by probable cause. Thus, we cannot say that trial counsel was ineffective in failing to call Baize to testify.

Gray testified at the suppression hearing that on January 9, 1987, he and other officers discovered the bodies of the Smiths at their home. Subsequent investigation revealed that both Smiths had been strangled to death and someone had taken the Smiths' credit cards. On January 12, 1987, Andrew informed the police that he had seen the Smiths' credit cards in the possession of Petitioner and Cauthern. Andrew also provided information about the death of the Smiths that was corroborated by the police. Later that day, police went to question Cauthern and they observed Petitioner, Cauthern, and Barbee standing in front of a vehicle. The officers saw credit cards and checks with the Smiths' names on them in plain view in the open trunk of the vehicle. At this point, the officers arrested Petitioner, Cauthern, and Barbee. In the direct appeal of this case, this Court held that "it is profoundly manifest to us that [Petitioner's] arrest, supported as it was by the abundance of probable cause enumerated above, was lawful." Brett Patterson, 1989 WL 147404, at *4. Indeed, this Court noted that Petitioner could have been arrested for committing a felony (receiving or concealing stolen goods) in the presence of the arresting officers. Id., 1989 WL 147404, at *4 n.4. We agree with this Court's holding on direct appeal that Petitioner's arrest was supported by probable cause. We also conclude that

Petitioner has failed to show anything that could have been done by trial counsel to demonstrate that this holding was wrong.

In short, Petitioner has failed to demonstrate either that his trial counsel were deficient in the manner they challenged the legality of his arrest or that he was prejudiced by any alleged deficiency. This issue has no merit.

## B. Warrant

Petitioner contends that his trial counsel were ineffective because they failed to adequately challenge the validity of the search warrant in this case. Specifically, Petitioner contends that counsel were ineffective in failing to establish that the affidavit submitted in support of the search warrant contained false and misleading statements.

The affidavit in support of the search warrant in this case provides, in relevant part:

> On January 9, 1987, Clarksville Police Dept. found that the residents of 352 Hampshire Drive Clarksville, TN were both murdered (preliminary autopsy by Dr. Charles Harlan reports strangulation) and their house ransacked; said victims being Rosemary and Patrick Smith. Affiant has talked to a confidential informant whose identity has been made known to issuing judge and who has no record and no reason known to affiant to mistate [sic] the truth and is reliable, and who relates that he talked to Ronnie Cauthern who admitted to said informant that he participated in the robbery and murder of the said victims. Affiant has interviewed the said Cauthern who tells affiant that the purse belonging to the victim, Rosemary Smith, was at the above described premises on this morning, January 12, 1987. When affiant went to the above-described premises to talk to Cauthern this morning, 1/12/87, he observed personalized checks and credit cards belonging to the victims in the trunk of said Cauthern vehicle parked at the above-described premises. When said Cauthern was picked up for an interview, Officer R. Prost found credit cards belonging to the

victims in his (Cauthern's) coat pocked [sic], along with various cash in bills.

Petitioner contends that his counsel should have challenged this affidavit under State v. Little, 560 S.W.2d 403 (Tenn. 1978). In Little, the Tennessee Supreme Court held that

> there are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made.

Id. at 407. In addition, the supreme court stated that "[r]ecklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time." Id.

First, Petitioner claims that his counsel were ineffective in failing to assert that the affidavit was invalid because the phrase "When affiant went to the above-described premises to talk to Cauthern this morning, 1/12/87" is false. Petitioner claims that this statement is false because Griffey admitted that the reason he went to see Cauthern was to "arrest" him, not to "talk" to him. This assertion is not accurate. Griffey testified at the suppression hearing that his purpose for going to the location where Petitioner and Cauthern were located was "to see if I could find [Cauthern] and in talking to him about [the Smith murders]." In addition, Griffey testified at the post-conviction hearing that the reason he went to find Cauthern was because other officers had told him that they wanted to talk to Cauthern about the Smith murders. In fact, Griffey specifically denied that he went to find Cauthern in order to arrest him. Petitioner has failed to identify and we have been unable to find anything in the record that indicates that Griffey went to find Cauthern for any other reason besides talking

to him. Because there is no proof that Griffey's statement about going to talk to Cauthern was false or misleading, Petitioner has failed to show that his counsel were ineffective in failing to challenge the affidavit on this basis.

Second, Petitioner claims that his counsel were ineffective in failing to assert that the affidavit was invalid because the phrase "Affiant has talked to a confidential informant . . . who has no record" is false and misleading. There is no dispute in this case that this statement was technically false at the time it was made. Indeed, the post-conviction court found that the statement was technically false because at the time it was made, Andrew had previously been convicted of reckless driving, speeding, and disorderly conduct. However, the post-conviction court found that there was absolutely no evidence that the statement was made with intent to deceive the court or that the statement was made recklessly.

The evidence does not preponderate against the post-conviction court's finding that the statement was not made with intent to deceive the court and was not made recklessly. Indeed, there is no proof that Griffey knew that Andrew had a criminal record when he submitted the affidavit. Griffey testified during the post-conviction hearing that before he filled out the affidavit, he personally checked the Clarksville Police Department computer system to determine whether Andrew had a prior criminal record and the computer search indicated that Andrew did not have a criminal record. Griffey also testified that he relied on the fact that Andrew was in the Army and in his experience, people in the Army did not have prior felony convictions. Further, Hunt testified that because Andrew's prior convictions occurred in 1985 and 1986, they would not have appeared in the city computer system when Griffey checked for Andrew's record

in 1987.  Hunt testified that instead, the convictions would only have appeared in the county computer system.  Hunt also testified that the information from the county computer system was not copied and transferred to the city computer system until 1993.  In addition, Hunt testified that two of Andrew's three convictions were actually coded as civil adjudications.  Thus, we conclude that Griffey did not make the statement in the affidavit with intent to deceive the court. Further, we conclude that Griffey did not make the statement recklessly.  Under Little, "[r]ecklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time."  560 S.W.2d at 407.  Because Griffey's search of the city computer files indicated that Andrew had no criminal record, Griffey had reasonable grounds to believe that the statement in the affidavit was true.  Characterizing the officer's actions, in the best light for the petitioner, Griffey's conduct amounts to negligence, not recklessness.  As this Court has previously stated, mere negligent representation is not sufficient to invalidate an affidavit under the standards of Little.  State v. Cannon, 634 S.W.2d 648, 650 (Tenn. Crim. App. 1982). [5]

Third, Petitioner claims that his counsel were ineffective in failing to assert that the affidavit was invalid because the phrase "Affiant has talked to a confidential informant . . . who has . . . no reason known to affiant to mistate [sic] the truth and is reliable" is false and misleading.  The post-conviction court found

_____

[5]Petitioner also contends that his allegation that Griffey made the statement that Andrew had no criminal record intentionally or recklessly is shown by Bobo's testimony that he knew that Andrew had criminal connections in the community.  However, Bobo testified that he did not know whether Andrew had any prior convictions.  In addition, Bobo stated that he did not think that he had participated in obtaining the warrant and he only remembered reviewing the affidavit for some motions that were subsequently filed in this case.  Thus, there is no evidence that Bobo played any role in the completion of the affidavit or that Griffey had any knowledge about Bobo's suspicions about Andrew's criminal connections.

that there was no proof that this statement was made with intent to deceive the court or that the statement was recklessly made.

The evidence does not preponderate against the post-conviction court's finding that the statement was not made with intent to deceive the court and was not made recklessly. Baize testified at the post-conviction hearing that he met with the informant in this case in January of 1987 and took the informant's statement about the Smith murders. Baize testified that he believed that the informant was reliable because the informant knew about information that could only have come from someone who had been inside the Smith home at the time of the murders. Griffey testified at the post-conviction hearing that he based his statement in the affidavit that the informant was reliable on the information he received from Baize and on the interview he had with Andrew after Petitioner and Cauthern were arrested. In addition, Griffey testified at the suppression hearing that he believed that Andrew was reliable because Andrew had informed the police that Cauthern had said that he and Petitioner had murdered the Smiths and Andrew had seen Cauthern with one of the Smiths' credit cards. Griffey also testified that when he went to find Cauthern, he saw Cauthern and Petitioner working on a car that contained the Smiths' credit cards in plain view. Thus, we conclude that Griffey did not make this statement in the affidavit with the intent to deceive the court and did not make the statement recklessly. Indeed, because Andrew provided the police with information about the crime that could have only come from someone who had been in the Smith home and because the police subsequently corroborated Andrew's claim that he had seen Cauthern with one

of the Smiths' credit cards, it is clear that Griffey had reasonable grounds to believe that Andrew was reliable.[6]

In short, there is no evidence that the statements made by Griffey in the affidavit were made with intent to deceive the court or that the statements were recklessly made. Thus, we conclude that Petitioner's counsel were not ineffective in failing to challenge the validity of the warrant on this ground. This issue has no merit.

## C. Joint Trial

Petitioner contends that his trial counsel were ineffective in failing to file a motion to sever his trial from the trial of Cauthern. Petitioner argues that his trial counsel should have sought a severance because the joint trial resulted in admission of Petitioner's statement to police that was redacted pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to eliminate all references to Cauthern. Specifically, Petitioner claims that he was prejudiced by introduction of the redacted statement because "his own redacted statement rendered his confession more incriminating than before the redaction."

Although Petitioner makes the conclusory argument that his redacted statement was more incriminating than his unredacted statement, he has failed

---

[6]Petitioner also contends that his allegation that Griffey made the statement that Andrew was reliable with intent to deceive the court or recklessly is shown by Bobo's testimony that he knew that Andrew had used aliases in the past, had dressed like a female on occasion, and had "kinky" sexual habits. However, as previously noted, Bobo stated that he did not think that he had participated in obtaining the warrant and he only remembered reviewing the affidavit for some motions that were subsequently filed in this case. Again, there is no evidence that Bobo played any role in the completion of the affidavit or that Griffey had any knowledge concerning Bobo's suspicions about Andrew's allegedly deviant behavior.

to identify any portion of the statement that became more incriminating after it was redacted. Indeed, we have reviewed both the redacted and unredacted statements and conclude that the redacted statement is not significantly more incriminating. Indeed, this Court concluded on direct appeal that admission of the redacted statement into evidence was proper. Brett Patterson, 1989 WL 147404, at *6.

In addition, we note that the decision of Petitioner's counsel not to seek a severance was a tactical one. Indeed, Richardson expressly testified during the post-conviction hearing that "I don't remember if we moved for a severance or not, but tactically speaking, we definitely wanted [Petitioner and Cauthern] tried together." Richardson also testified that part of the strategy was to attempt to contrast Petitioner and Cauthern as much as possible in terms of attitude and culpability. Similarly, Barrett testified that one of the trial strategies was to "show that Cauthern was really the moving party" and Petitioner "played a very, relatively speaking, minor role compared to Mr. Cauthern." This Court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); Alley v. State, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997). "Trial counsel may not be deemed ineffective merely because a different procedure or strategy might have produced a different result." Alley, 958 S.W.2d at 149. We conclude that counsels' decision not to seek severance in order to contrast Petitioner's participation in the crimes with that of Cauthern appears to have been informed and based upon adequate preparation. We cannot second-guess counsel in this regard. See Hellard, 629 S.W.2d at 9. This issue has no merit.

## D. Voluntariness

Petitioner contends that his trial counsel were ineffective in failing to adequately address the voluntariness of his statement to police.

The record indicates that Petitioner's trial counsel filed a motion to suppress Petitioner's statement to police on the ground that the statement was involuntary. The record also indicates that during the suppression hearing, Petitioner's counsel questioned Gray about the length of the police interview of Petitioner and whether Petitioner invoked his right to counsel or his right to remain silent. Counsel also questioned Petitioner about his interview with police, and Petitioner testified that the entire interview was not recorded, that Gray told him that Cauthern was putting the blame on him, and that Breedlove told him that cooperation could mean the difference between a life or a death sentence. Counsel then questioned Breedlove about the length of Petitioner's interview, whether the entire interview was recorded, whether Petitioner was informed that Cauthern was blaming him for the crimes, whether Petitioner was advised of his rights, and whether he made any promises to Petitioner that cooperation could mean the difference between a life or death sentence.

Petitioner claims that trial counsel failed to adequately address the voluntariness of his statement because counsel failed to question Breedlove about whether he made any promises that Petitioner would not receive the death penalty if he confessed to the murders of the Smiths. This allegation is simply not accurate. The record indicates that during the suppression hearing the following colloquy occurred between the prosecutor and Breedlove:

[Bobo]: I believe—of course, the Court has [the transcript of Petitioner's statement], but toward the end there, after completion of the statement, there was some statements about whether it might be life or death?

[Breedlove]: Yes.

[Bobo]: Had that been brought up at any time before [Petitioner] bringing that up?

[Breedlove]: No, sir. Not at all, I think, you know, the main reason why I said that at that point more than anything was to encourage him that he did the right thing and, you know, basically it was no promise—that there would be a difference between life and death, but we were more or less trying to let him know that what he did was the right thing by telling the truth.

Shortly thereafter, the following colloquy occurred between Petitioner's counsel and Breedlove:

[Richardson]: And . . . were there any comments—you said that you made the comment toward him of life or death merely to encourage him to tell the truth?

[Breedlove]: Yes, sir. Well, you know, he was feeling pretty bad at that point, and we just—you know, we weren't going to sit and talk down to him, and you know, it would have done him no good at that point, because he had done told us the truth, and it was more at that stage to encourage him somewhat. We knew it was a bad situation, he understood—he had full knowledge, you know, that he was, you know, in trouble, and I guess under arrest and he expressed some remorse I guess that he told the truth, because he knew, as his statement—that he just hung himself.

[Richardson]: Prior to the written statement being made, the taped interview, were any comments made about promises or assurances or encouragement made as far as life or death were concerned?

[Breedlove]: No. No. No. The only time it was made was at the end.[7]

In this case, it is absolutely clear that, despite Petitioner's contentions, his trial counsel did question Breedlove about whether he had made any promises about cooperation resulting in a life sentence rather than a death sentence. Petitioner has failed to identify anything more that counsel could have done to

---

[7]We note that the transcript of Petitioner's statement indicates that Breedlove only made one reference to the death penalty during the interview with Petitioner. Page sixteen of the seventeen page transcript contains the following statement by Breedlove: "You know, you're sorry for what happened, that will change it from a death sentence to life." The record indicates that Breedlove did not make this comment until after Petitioner had already given most of his incriminating statement. The part of Petitioner's statement that came after Breedlove's comment is basically insignificant.

more fully develop this issue. In addition, Petitioner has failed to identify any additional evidence that counsel could have obtained that would have changed the trial court's ruling that his statement was voluntary. Thus, Petitioner has failed to show that his counsel were deficient in the manner in which they addressed the voluntariness of his statement. This issue has no merit.

### E. Transcript of the Sentencing Hearing

Petitioner contends that his appellate counsel was ineffective in failing to include the transcript of his sentencing hearing in the record on direct appeal.

Petitioner argues that his counsel's failure to include the transcript of the sentencing hearing in the appellate record prejudiced him because it resulted in a waiver of his claim that the trial court erred when it imposed consecutive sentencing. However, this Court did not treat this issue as waived on direct appeal. Indeed, this Court stated that

> As a prerequisite to imposing consecutive terms, we must be able to place [Petitioner] into at least one of the Gray categories, and find confinement necessary to protect the public from further criminal conduct by the defendant. Gray v. State, 538 S.W.2d 391 (Tenn. 1976). We can and do.
> We find that the record as a whole, and particularly the chilling details of the crimes as related by [Petitioner] at the sentencing hearing, absolutely justifies the sentences imposed, and fully supports [Petitioner's] categorization as a dangerous offender for whom consecutive sentencing is appropriate.

Brett Patterson, 1989 WL 147404, at *9.

Because this Court was able to address the issue of consecutive sentencing on the merits, it is absolutely clear that Petitioner was not prejudiced by the failure to include the sentencing transcript on appeal. Indeed, Petitioner

has failed to identify any portion of the sentencing hearing transcript that would have affected this Court's holding that consecutive sentences were entirely appropriate. This issue has no merit.[8]

## F. Opening Statement and Closing Argument

Petitioner contends that his trial counsel were ineffective in failing to object to portions of the prosecutor's opening statement and closing argument.

First, Petitioner contends that trial counsel were ineffective in failing to object during the prosecutor's opening statement when he said that the "880 cord" that was found in Petitioner's jacket was the murder weapon and when he referred to Petitioner as "little," "on the prowl," "creature," and "comrade." However, on direct appeal, this Court specifically determined that there was nothing improper about the prosecutor's statement that the "800 cord" was the murder weapon because the facts adduced at trial supported that inference. Brett Patterson, 1989 WL 147404, at *7. In addition, this Court held that the prosecutor's reference to Petitioner as "little," "on the prowl," "creature," and "comrade" were "neither so demeaning nor derogatory as to constitute an appeal to passion, prejudice, and sentiment" so as to require analysis under the test of Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976). Id., 1989 WL 147404,

---

[8]In a related issue, Petitioner contends that trial counsel were also ineffective in failing to call him to testify during the sentencing hearing, failing to introduce testimony about his good military record, and failing to introduce evidence about his psychiatric history. However, the record indicates that at the close of the State's proof during the sentencing hearing, Richardson informed the trial court that he had discussed the matter with Petitioner and Petitioner had stated that he did not want to testify or introduce any evidence during the hearing. The trial court then asked Petitioner whether he was aware of his right to testify and offer proof and Petitioner stated that he was. Thus, it is clear that counsel did not decline to offer proof during the sentencing hearing because they were ineffective, but declined to offer proof because they were following Petitioner's instructions.

at *7. Because this Court has previously determined that the prosecutor's remarks during his opening statement did not prejudice Petitioner, it is clear that his counsel were not ineffective in failing to object to the comments.

Second, Petitioner contends that trial counsel were ineffective in failing to object when the prosecutor referred to Petitioner during his closing argument even though Petitioner had waived closing argument. However, this Court held on direct appeal that although the prosecutor's references to Petitioner were not appropriate, Petitioner was not entitled to any relief because of them. Id., 1989 WL 147404, at *7. Because this Court has previously determined that the prosecutor's remarks during his closing argument did not prejudice Petitioner, it is also clear that his counsel were not ineffective in failing to object to the comments. This issue has no merit.

## G. Investigation and Conduct of the Trial

Petitioner contends that his trial counsel were ineffective in failing to adequately investigate this case and in the manner in which they conducted the trial.

First, Petitioner contends that his counsel were ineffective because they failed to interview Andrew, Denning, and Barbee before trial. However, Petitioner has failed to indicate how he was prejudiced by this failure. Indeed, Petitioner has failed to give any explanation at all about how the outcome of his trial would have been any different if counsel had interviewed these witnesses before trial.

Second, Petitioner contends that trial counsel were ineffective in failing to investigate to determine whether Denning, Andrew, and Barbee had made any deals with the State in return for their testimony at trial. Specifically, Petitioner claims that this failure prevented counsel from impeaching these witnesses. However, the record indicates that Petitioner's counsel filed motions for discovery of any agreements the State had with its witnesses. In addition, Petitioner's counsel cross-examined Denning about whether he had made a deal with the State, and Denning admitted that he had made a deal in which he would not be prosecuted for various matters if he testified in this case. Petitioner's counsel also cross-examined Denning about the numerous statements he had given to police and the relationship between the statements and the deal he had made with the State. Although the record indicates that Andrew was paid up to $1,000 from the Crimebusters Fund for his cooperation in this case, nothing in the record indicates that he made a deal with the State in return for his testimony. In addition, Cauthern's counsel cross-examined Andrew about whether he had made any deals with the State and whether he had a reputation for unusual behavior such as cross dressing. Further, although the record does indicate that Barbee made a deal with the State in return for his cooperation in the investigation, the record indicates that Barbee did not testify at trial. Obviously, Petitioner's counsel could not have impeached the testimony of someone who did not testify. Petitioner has failed to show that he was prejudiced by the alleged failure to investigate and determine whether the State had made deals with its witnesses.

Third, Petitioner contends that trial counsel were ineffective in failing to investigate to determine whether Denning, Andrew, and Barbee had criminal

records so that the witnesses could be impeached at trial. However, the record indicates that Petitioner's counsel filed motions for discovery of the criminal records of all State witnesses. In addition, Petitioner's counsel made an agreement with the State that required the State to disclose the criminal records of its witnesses. Both Richardson and Barrett testified that they could not remember whether the State had given them the criminal records of its witnesses. However, Barrett testified that even if he had seen Andrew's criminal record, he would not have used it for impeachment purposes because the prior convictions were for insignificant matters. Indeed, the record indicates that Andrew's prior criminal record consisted of convictions for reckless driving, speeding, and disorderly conduct. Similarly, Denning's prior criminal record consisted of convictions for possession of marijuana, driving under the influence of an intoxicant, and driving on a revoked license. Likewise, Barbee's prior criminal record consisted of convictions for driving under the influence of an intoxicant and failure to drive with reasonable care. Once again, the record indicates that Barbee did not testify at trial, and thus, there was no opportunity to impeach his testimony. In addition, the criminal records of Andrew and Denning had little, if any, impeachment value. Thus, Petitioner has failed to show that he was prejudiced by his counsel's failure to obtain these criminal records.

Fourth, Petitioner claims that Richardson provided ineffective assistance of counsel when his questioning of a witness "opened the door" and allowed the State to introduce a shotgun into evidence. The shotgun had previously been suppressed by the trial court. However, Petitioner has failed to provide any explanation for how he was prejudiced by introduction of this weapon other than a conclusory statement that the prejudice is obvious. This conclusory statement

is insufficient to satisfy Petitioner's burden of showing that he was prejudiced by his counsel's deficiency.

Fifth, Petitioner contends that his trial counsel were ineffective in failing to call him to explain the meaning of a "jungle war certificate" he obtained in the military and to testify that he received an honorable discharge from the army as well as various letters of merit and commendation. However, Petitioner has failed to specifically identify any prejudice that resulted from the failure of his counsel to call him to testify. In addition, it appears from Barrett's testimony during the post-conviction hearing that the decision of Petitioner's counsel not to introduce any evidence was based on their strategy of attempting to show that Petitioner only played a minor role in the events that occurred at the Smith residence. We are not free to second guess counsels' tactical decision. See Hellard, 629 S.W.2d at 9.

In short, Petitioner has failed to show that, without the alleged deficiencies of counsel in their investigation of the case or the manner in which they conducted the trial, there is a reasonable probability that the result of the proceedings in this case would have been different. Thus, we conclude that Petitioner has failed to demonstrate prejudice. This issue has no merit.

## IV. CONCLUSION

In conclusion, Petitioner has failed to show that the post-conviction court erred when it dismissed his petition for post-conviction relief. As to his claims regarding ineffective assistance of counsel, Petitioner has either failed to show

that his counsel were deficient or that there is a reasonable probability that the result of the proceedings would have been different without the alleged deficiencies. As to his other claims, they are not cognizable in a post-conviction proceeding because this Court previously determined on direct appeal that the issues have no merit. Accordingly, the judgment of the post-conviction court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE


CONCUR:


_____
THOMAS T. WOODALL, JUDGE


_____
NORMA MCGEE OGLE, JUDGE